Please call the next case. Thank you. Good morning. On behalf of Zepeda Construction, Brad Elward. Before I begin, I just want to apologize for the reply brief. I noticed we had a repeat of our typo. We referred to Section 8J. I think as I need new glasses because as I started getting closer to it, I realized that they looked alike in it. It should have been referring to 8F. So I apologize for that. I know better than to do that. But the issues that we raised in the brief are essentially two. The propriety of the denial of our 19F and the issue relating to the penalties or attorney's fees in this case. And what I'd like to do is just take a few minutes and talk about the attorney's fees aspect and the cost. Because when we look at the reasoning that the Commission used here to say that the attorney's fees and costs were proper and should be awarded against the client, I think they violated this Court's decision in Reynolds. And I say that for this reason. When we look at how the Commission worded this, they said the award of attorney's fees and costs is based on the employer's continued prosecution, and I'm paraphrasing this, of its Section 8F petition following Dr. Treister's deposition in October 2007. And what this suggests to us is the Commission simply looked at the doctor's deposition testimony and said, well, it was the same testimony that he gave in the underlying arbitration, so that ends the dispute. And from that day forward, we have no further legitimate controversy. And I don't think that's how we can read it. And I would point the Court to Dr. Walsh's testimony. We went out and got an IME who came in the following year and specifically criticized that doctor's opinions with respect to the need. So to say that that doctor's reassertion of his prior opinions is the end-all of that fact question, when we had an IME that came in and said, no, I disagree and I disagree for these reasons, I think that's wrong and that violates Reynolds. You know, Reynolds says, I don't have to be right when I rely on a doctor's testimony, opinions, et cetera. The Commission doesn't have to adopt those. But the fact that I offered them, if there's a reasonable basis for those, means I don't get subjected to penalties. And I remember when we argued the Reynolds case, that was a very similar case to what we have here. But I would say this. Even if we look beyond the other cases, I think that's wrong. I would say that's wrong. I would say that Dr. Walsh was not a clinical treater, suggesting that he was employable not because of the absence of physical injury, but because of the absence of psychological problems. Well, I think there was a Dr. Walsh testified on the physical aspect. And I think the other IME that we offered, Dr. Handon is the one who criticized the psychological aspects and says, I don't think that there's a legitimate psychological problem here. I think there's an underlying exaggeration, exaggeration of the conditions. And the interesting thing I think there, Your Honor, is one of the aspects of our petition that we filed was based on petitioners, as we saw it, his lack of credibility. And we introduced a whole host of evidence that talked about his lack of credibility. And if you couple the lack of credibility with the findings from Dr. Hanlon that talk about strong tendency to support symptom magnification, no objective evidence of depression or post-concussion syndrome, you've got at least a factual dispute there. And I think that's what we need to look at. But there's a concern that the slippery slope, and you are a vastly experienced attorney, you know the well-settled law and the credibility questions are within the province of the Commission. So how do we find that the claimant was not credible? Well, no, okay. I'm not saying to this Court, well, I think in our argument on 8F, we make the argument generally. But on the issue of the penalties, and that's where I really would like to focus, the fact that we offered to the Commission, who was deciding this motion as a trier of fact, evidence that the petitioner was not credible and how that credibility or lack thereof affected whether or not he had a continuing disability. Because remember, my standard in that motion is whether or not he has a continuing inability to work. All this goes together. So that's why I say, and I'm harping on the credibility aspect here, whether it's the CDL, the fact he didn't tell his doctors about it, the fact that he misrepresented on the license, where he lived, the fact that he was able to perform that work, all that stuff goes to the whole argument that we made, that this guy is not credible. If he's not credible, that then enhances the opinions of Dr. Hanlon, you couple those with Dr. Walsh's IME, and we thought we have a reasonable basis to say terminate the benefits. Now, again, if you disagree with our position on whether or not the benefits should have been terminated, that's one thing. But to look at this and say, well, we disagree with you and now we're going to penalize you or we're going to uphold the penalties in this case, I think that's wrong. And that's what Reynolds tells us, is that in that case, we put on an offense, we put on medical, and here we had a lot of medical, we had a lot of other evidence. Was it reasonable? I think it was. Well, that's Reynolds. And that says that this $8,500 in attorney's fees goes out the window and the roughly $950 in costs. Now, I know that doesn't sound like a lot of money, but it's the principle of the matter and it's the consistency and, you know, I think if you look at that issue specifically, I think that we have to reverse on the abuse of discretion. The cases are kind of back and forth on whether it's abuse of discretion. I think Reynolds said discretionary standard applies. I think we went on both standards, whether it's manifest weight or abuse. So I wanted to concentrate on that point. I think that's really the glaring problem with this case. I understand your position on the issues with respect to the propriety of the 8J, whether or not we can reverse that. I think we've got some good arguments. Does it cross that threshold? That's your call. But I think on this other issue on the penalties, I think we really demonstrated that this case does cross that threshold and that this is a Reynolds case. Thank you. Thank you, Counsel. Counsel, you may respond. Good morning, Your Honors. Counsel Pete Bobber on behalf of claimant Daniel Britsky. Your Honors, Mr. Elward argues essentially that the Commission awarded penalties against his client for seeking these medical opinions and obtaining the evidence. That's not accurate. What is accurate is we have no objection to him obtaining the medical opinions. Mr. Britsky appeared for all three hearings, but he did not appear for the initial arbitration hearing. What's interesting here, and what sets this apart from Reynolds, is here the employer bears the burden of proof. This is not the initial arbitration hearing, where I have the burden of proof. Here, Respondent brings this motion because it believes it has a good faith basis to prove by a preponderance of the evidence the necessary evidence to sustain its motion and win it. Our position and the position of the Commission was here, once they obtained this medical evidence that they chose to present to the Commission, that they couldn't sustain that burden. Well, he's saying we've got three doctors, Werner, Hanlon, and Balsh, that we relied on. So where did they go wrong in doing that? Where they went wrong was with what the doctor said. What's in the doctor's reports, Your Honor? And the thing is this. Doctor Weiner, in her, she was the first one, in her report, she attacks causal connection. She attacks and says, Mr. Britsky's injury to his teeth is not causally related. His back injury is not causally related. Well, we're not addressing causation. She treated this, Dr. Weiner treated this like an initial IME. She had no consideration for the fact that the arbitrator had already ruled in this matter, and had already found causal connection. So what Dr. Weiner needed to do is say, okay, since Mr. Britsky testified in this matter in 2004, how has this condition changed? Has he improved? Well, how about this? Maybe throw in there that he sought to renew his CDL in Virginia. Why did he do that if he didn't feel like he was capable of doing that? Well, I don't recall that part of the record. I thought there may have been some testimony that he always remained hopeful that he would be able to return to work. And if it isn't, I apologize, and I don't want to mischaracterize what's in the record. I don't want to mischaracterize what's in the record. Your Honor, so that just offers a possible explanation for why he would do it. There's no evidence that he attempted to work. The video surveillance that employer brought in was him getting in and out of his personal vehicle. And, by the way, that evidence wasn't shared with the doctor. No doctor looked at that video and said, ah-ha, he can work as a truck driver. He can work as a delivering things, delivering autos. He can work as a truck driver. There's no evidence that he became a 52-year-old leader because of not working at all. That's not me, it was his employees.  You're talking about . . . What I'm asking you to do is to try to break it open and look at some thoughts that we had on him, his autoparts. That's true, Your Honor. In addition, Walsh never addresses the back injury. I've been treating this guy, and he's got some serious problems here. And they're psychological in nature, is that correct? Correct. And that he can't work. And Treister says he can't work. That's correct, Your Honor. So the argument, I suppose, is, in the face of that evidence, they could never sustain their burden because they couldn't come forward with evidence there was none, other than to retry the original hearing. Exactly, Your Honor. And that's the crux of my argument, is that there's no medical evidence that's subsequent to the original arbitration hearing that this man's physical condition or psychological condition changed or improved. So then the only other analysis we can perform is looking at the vocational aspect of the case. So for example, hypothetically, if we had a claimant who was deemed totally permanently disabled, and then subsequently maybe they went out and got a college degree, and then could perform some sedentary job or desk job or something like that that maybe before they were manual labor, well, arguably, a petition in that motion like this, in that instance, could survive not with no change to the medical situation, but a change to the vocational situation. Here, this injured worker obtained additional skills, and now they're employable, or maybe even employed. And that's exactly the burden that employer possesses. Employer didn't come in with a vocational expert who assessed Mr. Britski and said, well, we, you know, he obtained these skills or he got these skills now, and even with his physical limitations, I think he's employable. So more of a, you know, the odd lot questions that we ask. Odd lot, total permanent disability. But here, there was none of that. Their vocational evidence is the issue about the license. And their argument is because he renewed his driver's license by submitting an application, he's employable. I'm going to throw something out here, and I'm going to shape the facts more heavily towards the employer just to kind of make the point of this. I thought it was interesting, and I was grappling with this when I read it. But let's suppose you have the medical evidence, just very strongly in favor of the employee here, the claimant. And here, I think, you know, the testimony of the claimant's doctors was pretty strong. They're saying he can't work, can't work. Then you have the claimant saying, doggone it, I can. I can work. I can get back to what I was doing before. But you have this very strong-willed person, not actually working, but making statements to that effect, sending that signal. And what I'm wondering about is, from the employer's standpoint, is it reasonable for them, for the employer, to discount the medical opinions that are coming out of saying, this guy can't work, focus solely on the statements of the employee that, yep, I'm capable. I can get back into it and proceed with the IME course that, you know, here the employer did. Is it reasonable, and is it not vexatious for them to pursue that course? And I'm talking now about the penalties portion of this. You know, how much stock can they put into the employer, the employee's words and conduct here? Because now I'll get it back to the facts of this case, the application for the renewal of the CDL. Does that get them past having to put 100 percent stock in what the doctors are saying? Your Honor, I think that where your question – I have a problem with the question in its relation to these facts, is that Mr. Britski never offered the opinion that he was employable by renewing the license. I told you I was going to say that. I understand. I mean, but I guess in the hypothetical that you offered, if a claimant did – was strongly adamant that they had that opinion and, in fact, maybe went out and got a job, well, then they're employable. Doesn't get the job, okay? Just says things along those lines. I can work. I can do it. Well, unless that claimant is a licensed medical doctor, I don't think they have the expertise to offer that opinion because we're talking about physically, whether he's physically able to perform the functions of any occupation. That's the first issue. And, obviously, if one is actually doing it, that would be the best evidence, and that would undermine a medical opinion, to the contrary. But if you're saying claimant versus licensed medical doctor, I think the licensed medical doctor wins in offering those opinions. Okay. Do you have a case that says that? Because I'm just reading 8F here. Is able to do so. And so I think what my colleague is saying is that – and you're saying no, it can't be – that the application for the Virginia CDL is a statement against interest, really, an action, conduct against interest. That goes to is able. That goes to, perhaps, a non-vexatious assumption that they're able to do so. He testified, did he not, that he was totally unaware when he replied for the CDL that he was certifying that he was physically and psychologically able to operate a truck? That's correct, Your Honor. He said he didn't know it, and he also said that whether he applied for a CDL or not, he'd still never be able to drive a truck because he couldn't pass a DOT physical. That's correct. That's the last impediment. He hasn't undergone a DOT physical. So the question, because merely applying for a CDL, is that truly an admission against interest? I would argue it's not, Your Honor. I don't know how that's different than maintaining any other qualification one has for employment, such as if I renew my law license every year, even though I'm not practicing, I don't know that the renewal, the process of the renewal indicates that I am able. So let me answer your question. Let me put myself out there a little bit with a question. You have a burden of proof in the original arbitration and up to the original decision, and, of course, the employer can rely on whatever medical opinions they have to deny benefits, because they have doctors saying he's not permanently disabled. But once it comes to an 8F or a 19H, now it's the employer's burden. And after it's been originally found by the commission, the original hearing, does the employer have to come up with something different than what he had in the original hearing in order to meet his burden? Absolutely. Absolutely. Anything in this case that's new? My argument is it's not. In fact, he possessed the same license at the time of the original arbitration hearing, and that's in evidence. That's in this record. And lastly, if I may, about the award of the fees and costs, there were no penalties awarded here. It's fees and costs from Section 16. From a policy consideration, if the commission didn't award those fees and costs here, essentially employers then are given the incentive to continually file and prosecute these types of motions in cases of total permanent disability benefits, which would have the effect of the claimant having to use his own disability benefits that he's then receiving to routinely and continually fund its legal defense of these motions, thereby essentially and effectively reducing or eliminating those benefits for the claimant's personal use. Now, is there a time limit on that? Not made up. Because the benefit's payable for his lifetime. They can come in at any time. We know from the King case they can always request an examination as long as it's reasonable. Here they did three. Mr. Britski attended all of them. Thank you, Your Honor. I ask that the commission's award be affirmed in its entirety. Thank you. Counsel may reply. You know, the example that you gave is really, I mean, I've talked to trial counsel. It's exactly what prompted this entire course of litigation, except it wasn't his statements. It was his actions. And actions speak louder than words. Here's a guy, and I don't care if he didn't read all the line when you sign something, and he's holding himself out. I don't go play technicalities here. Common sense said this guy signed this and held himself out as somebody able to drive a truck in Virginia. And the problem is when you look at the facts underlying why he did it, he even misrepresented what he was doing when he filled the application out. The guy's not credible. And, you know, again, I want to focus on the penalties here. You're entitled to look at the evidence, you know, Justice Hoffman, and say, well, maybe you didn't meet all the three areas that we're talking about. But when we look at the penalties and we say, were we reasonable to say the guy's not credible, all this stuff comes out long after the arbitration is over. It's new evidence. It definitely shows he's misrepresenting things. He's lying. Then we find out, he says in his deposition or his arbitration testimony, that I rarely drive. I can't hardly drive. One doctor says, you know, if he could find a way to get to and from work, I'd say he could work, but he can't drive. We find out he's got a ticket driving. We find out that he's on a videotape driving. He's misrepresented things left and right in this case. And so we definitely had a trigger point and a basis to attack this. And, yes, I do think we can at some point, you've got to be able to look at a person and say, your words or your actions are inconsistent with what these doctors are saying. I mean, how many times do I come before you with an IME in a case and the commission has disregarded it and they rely on a chain of events? There's no difference. Now, and I would say this, when counsel made the comment with respect to what these penalties were for, when we look at 783 of the record, the penalties weren't for the filing of the petition and the instance of filing the petition without adequate documentation or anything of that. The penalties, and I say penalties, but the attorneys feel that they're penalties, they were awarded based on Dr. Treister's deposition. That was the trigger point. They're talking about the need. And they even acknowledged that if it weren't for the need, he'd be able to work in the brief. Well, we went out and got Dr. Walsh and he addressed the need. And he specifically criticized at page 409, well, I'm sorry, that's the wrong one. He specifically criticized Dr. Treister's findings with respect to the need. So we refuted that. You can't just say because the treating physician or the expert they used offers the same opinions as in the underlying case that the employer has automatically done. That doctor is not the trier of fact. The commission is. And that's what the commission said here, is that this doctor is the trier of fact because the day he offered his testimony, you were done. You could not refute this case. You could not continue to push this case forward. Let's read what the commission said. Let's read what the commission said. In awarding these attorneys fees and costs, the commission notes that the opinions of Dr. Treister and Dr. Trefone on the issue of petitioner's employability were previously relied upon by the commissioner in January of 2006. Decision on review. The commission finds that as of the second deposition of Dr. Treister on October 29, 2007, and forward, respondent began carrying out proceedings that did not present a real controversy or were frivolous. That's exactly right. Accordingly, from October 29, assessing attorneys fees, it is not unreasonable for the petitioner to obtain periodic examinations and spent time with regards to that. Sure. So the question becomes, why did you present to the commission that was different than what had been presented in the original trial? Now, Treister and Trefone testified in this hearing, did they not? Yes. And they said, we've been treating him since then. That's correct. In fact, Treister said he's worse off now than he was then. We presented Dr. Walsh. And we presented Dr. Walsh after Dr. Treister's deposition. And not a word on psychological. Pardon me? Not a word on psychological. But the attorneys fees weren't awarded for psychological. No, we don't know that. That's a huge difference. Well, that's what the thing says. You've got to go with what they say. They said after Treister's second deposition. And Treister. They weren't going to award anything before that. Treister offered no opinions on the psychiatric or psychological basis. It was all on the knee. Yeah, but what did you present on psychological? And he's got a point. It doesn't matter. If there isn't something to be paid for doing this, you know that the employers are going to do this to Petitioners every time there's permanent total. They're going to drag them in and drag them in and run out of money. In certain cases. Unless, of course, they've got to pay for it. And then they won't do it. In certain cases, I'm sure there's penalties. I would say in more than just certain cases, with certain carriers. I have to be able to come in and challenge a situation like this where we find that the Petitioner is not credible and where we go out. I would say this, Your Honor. If we would not have went out and got Dr. Walsh's opinion following this and would have tried everything at the basis it was at that point, we'd have a different argument. And your comments, I think, would be much well suited to this decision. But we did. We have Dr. Walsh's testimony and opinions. And that was the basis of the penalties. It wasn't because of the psychiatric or the psychological. And for that reason, those attorney's fees were wrong. Thank you. Thank you, counsel. The court will stand in recess, subject to call. Subject to call.